IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

|  |  |  |
|---|---|---|
| Tara Elizabeth Hogue, | ) | Civil Action No. 6:14–3718-RMG-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on January 12, 2011, alleging that she became unable to work on December 15, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On February 7, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, an impartial vocational expert, appeared on November 9, 2012,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on December 19, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on May 1, 2014.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
>
> (2)    The claimant has not engaged in substantial gainful activity since December 15, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: obesity, depression, anxiety, and chronic lumbar pain (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a).  Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for six hours in an eight-hour day, and stand and walk occasionally. The claimant cannot climb, crawl, balance, or have any exposure to industrial hazards.  She can occasionally stoop and must be given the option to sit or stand at will.  She is limited to jobs with low stress setting with no more than occasional decision making or changes in work setting. She should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors.  The claimant should also have flexibility while standing to use a cane in one hand.
>
> (6)    The claimant has no past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

2

(7)    The claimant was born on December 21, 1964, and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. §§ 404.1568 and 416.968).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)   The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

3

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by

4

substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 44 years old on her alleged disability onset date (December 15, 2009) and was a couple of days away from her 48th birthday on the date the ALJ's decision was issued (December 19, 2012). She has a high school education (Tr. 37) and no past relevant work (Tr. 25).

On December 8, 2010, the plaintiff visited the University Family Medicine unit of the Medical University of South Carolina ("MUSC") (Tr. 397). She sought a prescription for Vicodin, but the attending physicians explained that they do not prescribe narcotics on the first visit (Tr. 397, 399). The plaintiff reported a history of knee problems and also reported rejecting past recommendations for knee surgery because she could not "afford to take the time off. She work[ed] three jobs and [was] a single parent" (Tr. 397). On observation, the plaintiff had a normal gait. She was given a prescription for an anti-inflammatory drug (Tr. 399).

The plaintiff has undergone periodic treatment for depression and anxiety. Medical records from Coastal Empire Mental Health reflect that the plaintiff was seen there on several occasions between December 2009 and October 2011 for depression and anxiety, during which time she was prescribed Paxil, Celexa, Lexapro, Trazodone, and Klonopin (Tr. 271-74, 564, 568, 600-07, 690-92). The plaintiff was also seen at the MUSC Institute of Psychiatry from November 15, 2010, until February 1, 2011, where she was assessed with anxiety, major depression, and post-traumatic stress disorder ("PTSD") (Tr. 325-328, 333, 352). The plaintiff's psychiatrists consistently reported that she exhibited impaired concentration, and, on her last visit at the Institute of Psychiatry on February 1, 2011, Elizabeth C. Call, M.D., indicated that her anxiety was not well controlled, as she was experiencing nervousness, agitation, and feelings of being easily overwhelmed (Tr. 331, 335, 339, 346, 351-52).

On February 23, 2011, the plaintiff received treatment in the Roper Hospital Emergency Department for lower back pain as well as weakness in her upper body and leg (Tr. 359-67). The disposition notes relate that the plaintiff had "actually no weakness on exam. She ha[d] sciatic pain, no perianal numbness, [was] able to ambulate with a cane" (Tr. 362). X-rays showed only degenerative changes (Tr. 362, 365). The plaintiff was stable upon discharge, and she was encouraged follow up with her primary care physician (Tr. 362).

On March 4, 2011, the plaintiff visited Coastal Carolina Medical Center (Tr. 524-27). The plaintiff did not mention a fall, but complained of lower back pain since February 23, 2011. The plaintiff had crutches, but was bearing weight (Tr. 525).[2] Paul Zorch, M.D., ordered an MRI (Tr. 527), and the plaintiff was discharged in stable condition with a prescription for pain medication (Tr. 530).

---

[2] The plaintiff received crutches after spraining her right knee in June 2010 (Tr. 312).

6

On March 10, 2011, the MUSC Emergency Department admitted the plaintiff (Tr. 368-71). The plaintiff reported she had fallen a month earlier due to weakness in her legs, and she woke up the day after with excruciating, uncontrollable back pain. She also reported that she had been to the emergency room four times in February because of her back pain, which she rated as 8/10 when taking Lortab and 10/10 without it (Tr. 368). At MUSC, Dana King, M.D., expressed a "suspicion of drug seeking behavior" (Tr. 391). The plaintiff came in seeking Dilaudid, a Schedule II drug, or Toradol to help with her back pain (Tr. 368). The plaintiff acknowledged her past history of cocaine use, but reported that she had been clean for eighteen months (Tr. 369). However, she tested positive for opiates and cocaine (Tr. 370, 382). Due to her "positive cocaine use," MUSC would not prescribe her narcotics. Upon examination on intake, the plaintiff had normal strength and range of motion in her upper extremities, but decreased sensation from her left knee down. The attending physician, D. Todd Detar, D.O., could not assess gait, strength, range of motion, or patellar reflexes because the plaintiff would not cooperate with the examination (Tr. 368-70).

The plaintiff's pain improved during her stay at MUSC, and when discharged on March 12, 2011, she was ambulating around the floor (Tr. 368-71). The hospital's physical and occupational therapy unit evaluated the plaintiff and recommended outpatient physical therapy (Tr. 371). Her condition upon discharge was improved, her activity was not limited, and she was encouraged to return for physical therapy (Tr. 371). The plaintiff received an MRI during her stay that showed normal height and alignment along with "[s]ignificant arthropathy at the L4-L5 with a narrowing of the lateral recesses and displacement of the L5 transiting nerve roots" (Tr. 400). No surgical intervention was necessary (Tr. 388). The plaintiff was encouraged to follow-up with Dr. King at MUSC in one week.

7

On March 21, 2011, Dr. King examined the plaintiff (Tr. 385). Dr. King noted that the plaintiff arrived with "crutches but did not need to use them as she left the exam room" (Tr. 386). The plaintiff was "unable to get out of the chair during the official exam, but was able to get up unassisted when the encounter was concluded" (Tr. 386). Dr. King declined to prescribe narcotics given the plaintiff's history "of cocaine and other substance abuse" and noted that the plaintiff had seen "multiple doctors and [received] multiple controlled substances in recent weeks." Dr. King encouraged the plaintiff to keep her appointment with "Ortho" on March 30, 2011 (Tr. 387).

On March 28, 2011, the plaintiff saw her primary care physician, Samai Supan, M.D. Dr. Supan described the plaintiff's back as "normal except for pain and tenderness at both sides of lower lumbar area" (Tr. 413).

On April 1, 2011, the plaintiff returned to MUSC for a consult regarding her back pain (Tr. 482-85). She was not in any acute distress (Tr. 484), and the report shows that she was "not really fully cooperative with the exam" (Tr. 485). She reported that she had been experiencing back and leg pain since a fall in February 2011, with sharp, burning, electric sensations in her bilateral legs, left greater than right, and sharp pressure pain in her lower back with increased muscle spasms. The resident physician, Ebony Hilton, M.D., indicated that the plaintiff was having occasional numbness and tingling in her toes and that the "electric sensation" she was experiencing began in her lower back, ran down the posterior leg, then wrapped around to the front of her leg once it got to the level of her knee. Dr. Hilton stated that the plaintiff's pain was currently 10/10 and that lying down helped to alleviate her symptoms (Tr. 482).

Dr. Hilton noted in her report that the plaintiff's MRI at MUSC two weeks earlier had shown significant facet arthropathy at L4-5, with narrowing of the lateral recesses and displacement of the L5 transiting nerve root (*id.*). Dr. Hilton stated that "[t]he symptoms she gets are quite concordant with radiating pain of neuropathic nature she

8

describes in the L4 and L5 distributions bilaterally.  Worse on the left however" (Tr. 484).

Dr. Hilton assessed the plaintiff with lumbar degenerative disc disease "which in [sic] undoubtedly causing some of these problems, and the MRI is concordant with it" (Tr. 485).

While Dr. Hilton indicated that the plaintiff might need facet joint injections due to her facet arthropathy, she stated that it would be difficult to manage her condition with these injections alone.  Dr. Hilton further stated that, due to the plaintiff's size, a radiofrequency ablation procedure "would be out of the question" (Tr. 485).  Dr. Hilton was suspicious of the plaintiff's complaints, observing that "there is no way she [could] be as weak as she ma[de] it seem and still walk" (Tr. 485).  Dr. Hilton scheduled a lumbar epidural steroid injection, which was described as "just a therapeutic means of treating [the plaintiff's] symptoms."  To be completely pain free, the plaintiff was encouraged to lose weight and stop smoking (Tr. 484).  The plaintiff reported "several bouts of addiction to crack cocaine," making her physicians reluctant to prescribe narcotics for pain (Tr. 483).  Dr. Hilton prescribed Lortab, "given that anything that will aid in her mobility and burning calories is going to be helpful for her" (Tr. 485).

The plaintiff received the scheduled lumbar steroidal injection on April 18, 2011 (Tr. 480).

On April 21, 2011, Mary Lang, M.D., reviewed the plaintiff's medical record and completed a residual functional capacity ("RFC") assessment (Tr. 428-35).  Dr. Lang's assessment showed that the plaintiff had a number of exertional limitations, but could lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk at least three to four hours a day, and sit for about six hours per day in an eight-hour workday (Tr. 429).  Dr. Lang also determined that the plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl, but she could never climb ladders, ropes, or scaffolds (Tr. 430).  No visual, manipulative, or communicative limitations were identified (Tr. 431-32).  Dr. Lang recommended that the plaintiff avoid even moderate exposure to

9

hazards, but otherwise no environmental limitations were identified (Tr. 432).  Dr. Lang noted the plaintiff's inconsistent reports to treating physicians (Tr. 430) (i.e. the plaintiff "has crutches but did not need to use them at a 3/21/11 exam as she left the room . . . unable to get out of the chair during official exam, but was able to get up unassisted when encounter was concluded.").  While Dr. Lang found the plaintiff's allegations of pain were credible based on the medical evidence, she found the plaintiff's statements concerning the intensity and limiting effects of her symptoms were not credible (Tr. 433).

On May 4, 2011, the plaintiff underwent a consultative psychological examination with Gene J. Sausser, Ph.D. (Tr. 437-40).  Dr. Sausser indicated that the plaintiff presented in some emotional distress and appeared to obviously be suffering from anxiety.  He also indicated that she walked with some difficulty and needed a cane for support and that her walking was slow and unsure (Tr. 438).  Based upon his interview with the plaintiff and her psychological history, Dr. Sausser assessed her with major depression single episode, moderate; PTSD; and panic disorder without agoraphobia.  Dr. Sausser also diagnosed the plaintiff with cocaine dependence and alcohol dependence, but stated that these were both "in sustained full remission" (Tr. 439).

On May 12, 2011, Camilla Tezza, Ph.D., a state agency medical consultant, opined that the medical evidence she reviewed indicated that the plaintiff had several medically determinable mental impairments, with the impairment of "personality disorder" being rated as severe.  Dr. Tezza further opined that the plaintiff's mental impairments would result in moderate limitations in her ability to maintain social functioning, concentration, persistence and pace (Tr. 441-54).  Additionally, in a mental RFC assessment, Dr. Tezza opined that the plaintiff was not significantly limited in most areas of mental functioning, except that she was moderately limited in her ability to carry out detailed instructions, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from superiors (Tr. 455-57).

On May 25, 2011, x-rays showed degenerative disc disease at C5-6 and C6-7 without evidence of acute bony abnormality (Tr. 501).

On June 3, 2011, she returned to MUSC for a second injection, which decreased her lower back pain. By that time, the plaintiff's main complaint was shoulder and neck pain, resulting from a car accident (Tr. 476-77). The treating physician was reluctant to prescribe more pain medication given a lawsuit from the car accident and the plaintiff's history of drug abuse (Tr. 466). Additionally, the physician related that "[i]t is also very concerning that [the plaintiff] is clearly attempting to be manipulative regarding the use of Tylenol because she essentially implied to us that if we did not give her more pain medication she was going to continue to take the Tylenol," regardless of the potential for overdose (Tr. 477).

The plaintiff visited the Coastal Carolina Medical Center on June 25, 2011, after a fall (Tr. 518). She received Percocet for pain, was able to walk with her cane, and was released in stable condition (Tr. 519-20). She then sought treatment at Lowcountry Medical Group ("Lowcountry Medical"). On July 8, 2011, she had a slow but steady gait when walking with her cane. X-rays revealed no fractures, subluxation, or bony destruction and spondylolisthesis at L4-L5 and mild degenerative changes. The plaintiff received pain medication, and physical therapy was scheduled (Tr. 556). At her August 19, 2011, visit, she had musculoskeletal strength of 5 out of 5 (Tr. 553).

The plaintiff was initially seen by Albert Read Lewin, M.D., at Advanced Health Center in Beaufort, South Carolina, on October 5, 2011, at which time he reported that the plaintiff was experiencing low back pain with radiculopathy down her left leg and to her right knee. Based upon her history and the findings from her examination, Dr. Lewin assessed the plaintiff with bilateral sacroiliitis (Tr. 644). The plaintiff saw Dr. Lewin again on October 18, 2011, and reported that she was experiencing lumbosacral midline back pain with pain radiating into her left leg and paresthesia in her left foot. The plaintiff signed a "Pain

Management Agreement" with Dr. Lewin, and she was administered a left lumbosacral trigger point injection and was prescribed Hydrocodone and Carisoprodol to treat her pain (Tr. 641).

The plaintiff returned to her primary care physician, Dr. Supan, on October 25, 2011 (Tr. 613-15). He noted that the plaintiff's back was "[n]ormal except spinal tenderness in the lower lumbar region" (Tr. 613-14).

The plaintiff denied "any numbness, tingling or weakness" during her November 1, 2011, follow-up visit to Lowcountry Medical (Tr. 633). On November 11, 2011, Dr. Lewin assessed the plaintiff with lumbosacral plexus pain and radiculitis, and he again administered trigger point injections to treat her chronic symptoms (Tr. 638).

In a "Psychiatric Review Technique" dated November 23, 2011, Michael Neboschick, Ph.D., a state agency medical consultant, opined that the plaintiff had several medically determinable impairments, including depression, anxiety, PTSD, and panic disorder, which caused her to experience moderate limitations in her ability to maintain social functioning and concentration, persistence, or pace (Tr. 646-58). Additionally, Dr. Neboschick completed a mental RFC assessment in which he opined that the plaintiff was not significantly limited in most areas of functioning, except that she was moderately limited in her ability to interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors (Tr. 660-62).

On December 8, 2011, Jim Liao, M.D., essentially concurred with Dr. Lang's prior assessment of the plaintiff's physical RFC, including her assessment that the plaintiff's allegations of pain were credible based on the medical evidence, but the plaintiff's statements concerning the intensity and limiting effects of her symptoms were not credible (Tr. 664-71). Both Dr. Lang and Dr. Liao stated that "[t]here is no evidence of an inpatient stay for back pain as reported," which is inconsistent with the evidence previously cited of the plaintiff's admission to MUSC in March 2011 for back pain (Tr. 368-71).

12

In January 2012, the plaintiff continued treatment with Dr. Lewin (Tr. 759). While Dr. Lewin occasionally noted back tenderness at L4-S2 (Tr. 764, 767), his objective findings were often left blank on the progress notes (*see* Tr. 722-23, 730-31, 717-20, 733, 740, 743, 746, 750, 761, 769, 785-86, 788, 791, 792, 794-95). In the few notations where Dr. Lewin made objective observations and findings, he generally noted only that the plaintiff had a limited range of motion due to the back brace that he prescribed for the plaintiff (*see e.g.,* Tr. 725-26, 729, 744, 747, 751). The plaintiff regularly reported to Dr. Lewin that her lower back pain was on the 7-8 level (Tr. 717, 728, 730, 746, 750, 753). Dr. Lewin noted at one point that "patient's self-rating of pain is probably inadequate" (Tr. 791). During the time that he treated the plaintiff, Dr. Lewin frequently administered trigger point injections to her lower back (*see* Tr. 722, 755, 774).

When the plaintiff visited Dr. Supan again in June 2012, she related that her "back pain [was] better" (Tr. 709). Dr. Supan observed that her "spine [was] normal without deformity or tenderness, no CVA tenderness" (Tr. 711).

In September 2012, the plaintiff told Dr. Lewin that her pain medication was working "very well" (Tr. 743). She told Dr. Lewin that her pain was no longer in her lower back; instead, "majority of pain [was] in mid back" (Tr. 743). Dr. Lewin's report of September 20, 2012, indicates that the plaintiff was seen to review the results of her laboratory tests and the MRI of her lumbar spine (Tr. 738). On October 16, 2012, the plaintiff sought a higher dose of morphine, which Dr. Lewin prescribed (Tr. 753).

On October 25, 2012, Dr. Lewin responded to a questionnaire provided by the plaintiff's lawyer in which were listed questions regarding the plaintiff's ability to work based upon her subjective complaints (Tr. 697-98). The responses required no narrative responses from Dr. Lewin and required him to check a box to provide an answer (Tr. 697-98). Dr. Lewin indicated that the plaintiff would need to alternate position frequently and that she would need to lie down several times daily as a result of the back and leg pain

13

she experiences after performing light activities around her home.  Dr. Lewin also indicated that the plaintiff's pain would likely be more prominent on some days than others and that on these days she would need to lie down and rest most of the day (Tr. 697).  Dr. Lewin also opined that the plaintiff would likely need to take rest breaks on an unpredictable and unscheduled basis (including lying down) if she attempted to work; that she would be absent from work or unable to complete a full eight hour workday four days per month, and that she was incapable of working in any capacity on a regular and continuing basis.  Dr. Lewin responded "yes" to the question of whether the plaintiff's symptoms and her functional limitations as outlined in the questionnaire were "reasonably consistent with her objective medical findings from her MRI's and clinical examinations" (Tr. 698).

### *Administrative Hearing*

The plaintiff last worked in December 2009 and attributed her sporadic work history to a "panic/anxiety disorder" (Tr. 37).  The plaintiff reported quitting her last job as a fast food worker after getting into an argument with her supervisor (Tr. 38).

The plaintiff testified that she has experienced back problems for several years, but that her back pain significantly worsened after a fall in March 2011 (Tr. 38-39).  She testified that she was admitted to MUSC after her fall and that an MRI at the hospital revealed that she had nerve root displacement, which caused her back pain to radiate into her legs (Tr. 39).  She indicated that she was subsequently evaluated by a specialist at the Reuben Spine Center, but was told that she was not a candidate for surgery (Tr. 39-40).  She then began treatment with a pain management physician, Dr. Lewin, at Advanced Health Center, where she has undergone weekly trigger point injections which have only provided her with temporary relief (Tr. 40-41).  She testified that Dr. Lewin has also prescribed pain medication to treat her pain, including 30 mg. of morphine twice daily, which makes her lightheaded and affects her concentration (Tr. 44).

14

The plaintiff testified that her back pain is excruciating, it causes her to experience numbness and weakness in her legs, and she has been using a cane for approximately three years due to her leg symptoms (Tr. 41). She also experiences pain in her knees due to "bone on bone" in both knees (Tr. 41-42). The plaintiff also indicated that she has been taking medication for asthma for approximately seven or eight years and that she occasionally experiences shortness of breath and lightheadedness due to this condition when she stands up. She also indicated that she is sensitive to odors, fumes, dust, smoke, and similar substances (Tr. 42).

With regard to her physical capabilities, the plaintiff testified that she can only stay up on her feet for approximately ten or fifteen minutes and that it is difficult for her to remain in one position for any period of time. She indicated that she needs to lie down after standing or sitting for very long and that she therefore spends approximately two-thirds of the time in her recliner from when she wakes up in the morning until dinner time (Tr. 43). She testified that she can only lift around five pounds and that she is unable to perform such activities as bending, kneeling, and stooping (Tr. 43). The plaintiff testified that she is able to do some housework around her home such as washing dishes and clothes, but she is only able to do so a little at a time (Tr. 46-47). She also testified that she has problems sleeping and that she often wakes up during the night due to her pain (Tr. 47). She further indicated that along with the morphine prescribed by Dr. Lewin, her chronic pain also impaired her ability to concentrate and focus (Tr. 44).

The plaintiff also testified that she has experienced problems with depression, anxiety, and PTSD since her son died in 1992 (Tr. 45). She also testified that she has several panic attacks several times per month, which are often triggered by stress (Tr. 45). The plaintiff also indicated that the anxiety, depression, and PTSD cause her to be withdrawn and stay at home most of the time (Tr. 47).

15

The ALJ asked the vocational expert whether a hypothetical worker with the plaintiff's age, work history, and education; retaining only a sedentary capacity; who could not crawl, climb, balance or have exposure to industrial hazards; and who could only occasionally crouch and stoop; who needed to have the option to sit or stand and to use a cane in one hand; and who could work in a low stress setting with no more than occasional decision-making or setting changes, no interaction with the general public, and no more than occasional interaction with co-workers, or supervisors - could perform jobs in the national economy (Tr. 48).  The vocational expert testified that such hypothetical individual could perform unskilled, sedentary work that existed in the national economy (Tr. 48-49).  Specifically, the vocational expert concluded that the plaintiff could work as a: 1) surveillance system monitor (1,028,000 positions nationally; 14,400 in South Carolina); 2) weight tester (430,000 nationally; 8,800 in South Carolina); and 3) cutter and paster (27,000 nationally; 1,527 in South Carolina).  The plaintiff's counsel then asked the vocational expert hypothetical questions with additional limitations (frequent breaks on an unpredictable schedule, miss four days of work per month, and lie down periodically during the day).  The vocational expert testified that none of the jobs he identified in his testimony, nor any other jobs in the national economy, would allow a worker to lie down three of four times a day, take several unscheduled breaks, or be absent from work for four days per month (Tr. 49).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) performing an improper RFC assessment by failing to give proper weight to the opinion of treating physician Dr. Lewin; and (2)  relying on vocational expert testimony where the hypothetical did not include all of the plaintiff's limitations, resulting in the Commissioner failing to carry her burden of proof at step five of the sequential evaluation.

16

***Residual Functional Capacity and Treating Physician***

The plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence as the ALJ failed to give proper weight to the opinion of Dr. Lewin (pl. brief 13-18). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In the RFC assessment at issue here, the ALJ determined that the plaintiff could perform sedentary work with additional exertional and nonexertional limitations (Tr. 21). In assessing the plaintiff's chronic back pain, the ALJ discussed and analyzed the

17

objective medical evidence of record (Tr. 23), including an x-ray that showed no acute abnormalities (Tr. 362-65); a musculoskeletal examination in March 2011 that showed decreased sensation from the left knee down (Tr. 368-70); and an MRI that showed significant arthropathy at L4-5 with a narrowing of the lateral recesses and displacement (Tr. 482).   However, the ALJ noted (Tr. 23) that an October 2011 examination of the plaintiff's lower back was normal, except for tenderness in the lower lumbar region (Tr. 613-14); the plaintiff had 5 out of 5 musculoskeletal strength in August 2011 (Tr. 553); and the plaintiff's back was "normal without deformity or tenderness" in June 2012 (Tr. 711).

The ALJ also considered the fact that the plaintiff only received conservative treatment for her alleged physical limitations (Tr. 23). While the ALJ acknowledged the plaintiff received occasional injections in her back, he noted that the plaintiff had not attended physical therapy, had not received any TENS unit treatment, and surgery had not been recommended (Tr. 23).

The ALJ further discussed the plaintiff's motivations for seeking treatment, noting that physicians referenced repeated incidents of drug seeking behavior (Tr. 23-24). Notably, in June and December 2011, the plaintiff reported that she would take high doses of Tylenol if she did not get more prescription medication (Tr. 23 (citing Tr. 477, 675-76)). The ALJ also noted the plaintiff's inconsistent reports to physicians (Tr. 23): in March 2011, the attending physician in the emergency room could not assess gait, strength, range of motion, or patellar reflexes because the plaintiff would not cooperate with the examination (Tr. 368-70); in March 2011, Dr. King noted the plaintiff had crutches "but did not need to use them as she left the exam room" and "exaggerated pain . . . with only slight tough of low back" (Tr. 386); and, in April 2011, the examining physician, Dr. Hilton, stated that the plaintiff "appear[ed] to have normal strength lower extremities bilaterally, but it is hard to tell because she is not really fully cooperative with the exam. However, there is no way she can be as week as she makes it seem and still walk" (Tr. 485).

The ALJ also noted that there were multiple instances of inconsistencies in the plaintiff's medical history and inconsistencies between her subjective complaints and

the objective evidence (Tr. 24). For example, the plaintiff attributed her sporadic work history to her panic anxiety disorder, "but records indicate[d] that [the plaintiff] ha[d] been incarcerated on numerous occasions" (Tr. 24). Also, as pointed out by the Commissioner, despite alleging that she was disabled from all work beginning in 2009, the plaintiff told physicians that she was working three jobs in December 2010 (Tr. 397-98). The ALJ also discussed the fact that the plaintiff testified that she only got two-to-three days of relief from back injections; however, she told her attending physician that she got three weeks relief from lumbar injections (Tr. 24; *see* Tr. 41, 478). The ALJ further noted that in April 2011, the plaintiff told physicians that she had not used cocaine for eighteen months (Tr. 24; *see* Tr. 483), when in fact she tested positive for cocaine and opiates on March 12, 2011 (Tr. 370). She made the same representation of being "clean" for eighteen months to physicians prior to testing positive on March 12, 2011,  as well (Tr. 369).

The ALJ also considered and gave "some weight" to the RFC assessments made by the state agency's medical consultants, Drs. Lang and Liao, who determined the plaintiff could perform light work with occasional postural limitations (Tr. 24-25; *see* Tr. 428-35, 664-71).  The ALJ found that the opinions were consistent with the objective medical evidence, but he further reduced the RFC to sedentary exertional work in order to give the plaintiff the benefit of the doubt (Tr. 24-25).  The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be

19

discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

The ALJ also considered and assessed the opinion of Dr. Lewin, one of the plaintiff's treating physicians. The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled

20

to the greatest weight and should be adopted, even if it does
not meet the test for controlling weight.

*Id.* at *4.

As more fully set forth above, on October 25, 2012, Dr. Lewin responded to

a check-box questionnaire provided by the plaintiff's lawyer. Dr. Lewin indicated that the

plaintiff would need to alternate positions frequently and that she would need to lie down

several times daily as a result of the back and leg pain she experiences after performing

light activities around her home. Dr. Lewin also indicated that the plaintiff would be absent

from work or unable to complete a full eight hour workday four days per month and that she

was incapable of working in any capacity on a regular and continuing basis. Dr. Lewin

responded "yes" to the question of whether the plaintiff's symptoms and her functional

limitations as outlined in the questionnaire were "reasonably consistent with her objective

medical findings from her MRI's and clinical examinations" (Tr. 697-98).

The ALJ found as follows with regard to Dr. Lewin's opinion:

> In October, 2012, Dr. Albert Lewin stated the claimant can only
> sit or stand for approximately 15-to-20 minutes at a time, and
> that afterwards, she needs to lie down for one-to-two hours due
> to increased pain in her back that radiates into her legs. Dr.
> Lewin also stated the claimant is not capable of working in any
> capacity on a regular and continuing basis, and that she would
> be absent from work more than four days per month. (Exhibit
> 31F). This opinion has been considered, but has been given no
> weight. This opinion was a form opinion, in which Dr. Lewin
> merely checked a box next to each question. Further, Dr. Lewin
> failed to correlate his opinion with any objective evidence.

(Tr. 25).

The plaintiff argues that this assessment was in error because the ALJ did not

cite medical evidence that was contradictory to Dr. Lewin's opinion; did not evaluate all of

the factors discussed above; did not acknowledge that Dr. Lewin "specifically indicated" that

the plaintiff's symptoms and functional limitations were "reasonably consistent with her

objective medical findings from her MRI's and clinical examinations"; did not consider the

21

portion of Dr. Lewin's opinion indicating the plaintiff would need frequent and unpredictable rest breaks if she attempted to work; and did not consider evidence supporting Dr. Lewin's opinion.

The undersigned finds no error in the ALJ's assessment of Dr. Lewin's opinion. Courts in this circuit have recognized that checkbox forms such as the one at issue here have "limited probative value." *See Freeman v. Colvin*, C.A. No. 7:14cv00199, 2015 WL 5056734, at *4 (W.D. Va. Aug. 26, 2015) (citing *Leonard v. Astrue*, C.A. No. 2:11cv00048, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) and *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("Such check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician.")).

As more fully discussed above, in the RFC assessment, the ALJ considered the objective evidence, including x-rays and an MRI that showed the plaintiff had degenerative disc disease at L3-4 and L4-5 and significant facet arthropathy at L4-5 with narrowing of the lateral recesses and displacement (Tr. 23 (citing Tr. 580-81)). This evidence is presumably the "objective medical findings from her MRI's and clinical examinations" referenced in the form completed by Dr. Lewin (*see* Tr. 697-98). However, the ALJ noted that the plaintiff's medical providers routinely reported unremarkable examination findings with regard to her back (Tr. 23). Specifically, the ALJ noted that, shortly after the MRI, a physical examination of the plaintiff's lower back in October 2011 by Dr. Supan was normal except for reported spinal tenderness in the lower lumbar region (Tr. 23 (citing Tr. 614)). The undersigned does not find the ALJ's statement that Dr. Lewin "failed to correlate his opinion with any objective evidence" to be in error. While Dr. Lewin affirmatively checked a box generally stating that his opinion was "reasonably consistent with [the plaintiff's] objective medical findings from her MRI's and clinical examinations," he did not cite any specific objective evidence supporting the extreme limitations set forth in the opinion.

22

Furthermore, as noted by the Commissioner, Dr. Lewin's records lack consistent, objective evaluations of the plaintiff's condition (*see e.g.* Tr. 714-15 (failing to note any musculoskeletal limitations for spine, ribs, or pelvis and only reporting a normal gait)), and his examination findings show only occasional back tenderness at L4-S2 (Tr. 764, 767) with nothing more significant. The records generally recount the plaintiff's subjective statements only and provide the dates that she received trigger point injections, but the objective findings are blank (*see* Tr. 717-20, 722-23, 730-31, 733, 740, 743, 746, 750, 761, 769, 785-86, 788, 791-92, 794-95). The ALJ gave numerous reasons for discounting the credibility of the plaintiff's subjective complaints, including her drug-seeking behavior, the unremarkable objective medical evidence, her conservative treatment, and the inconsistencies in her reports to her medical providers (Tr. 22-24), as more fully discussed above.

As argued by the Commissioner, Dr. Lewin's conclusions are contradicted by the findings of other treating physicians around the same time. For example, Lisa Schrock, a certified physician assistant, examined the plaintiff in August 2011 and observed that the plaintiff had 5 out of 5 musculoskeletal strength (Tr. 553). Dr. Supan examined the plaintiff in June 2012, at which time the plaintiff related that her "back pain is better" (Tr. 709). Dr. Supan also observed that the plaintiff's back was "normal without deformity or tenderness, no [costovertebral angle] tenderness" (Tr. 711). Further, in September 2012, the plaintiff told Dr. Lewin that her new pain medication was working "very well" (Tr. 743).

The plaintiff contends the ALJ erred by failing to mention the limitation included in Dr. Lewin's opinion that she would need frequent rest breaks on an unpredictable and unscheduled basis (pl. brief 17-18 (citing Tr. 25, 698)). While the ALJ did not cite every limitation included in Dr. Lewin's opinion, the context of the ALJ's assessment of Dr. Lewin's opinion makes clear that he gave the entire opinion "no weight" for the reasons cited.

23

Lastly, the plaintiff argues the ALJ erred by failing to consider evidence that supported Dr. Lewin's opinion. Specifically, the plaintiff argues that the ALJ failed to consider the statement by Dr. Hilton in April 2011 that "[t]he symptoms [the plaintiff] gets are quite concordant with radiating pain of neuropathic nature she describes in the L4 and L5 distributions bilaterally. Worse on the left however" (Tr. 484). Dr. Hilton assessed the plaintiff with lumbar degenerative disc disease "which in [sic] undoubtedly causing some of these problems, and the MRI is concordant with it" (Tr. 485). While the ALJ did not cite this specific evidence, the ALJ specifically considered the MRI referenced in the form completed by Dr. Lewin and cited by Dr. Hilton here (*see* Tr. 23). The ALJ found that the plaintiff's medically determinable impairments - including her chronic back pain - could reasonably be expected to cause some of the plaintiff's alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of the symptoms were not fully credible for several reasons that have been discussed herein (*see* Tr. 22-25). In doing so, the ALJ noted that, after examining the plaintiff in April 2011, Dr. Hilton stated that the plaintiff "appear[ed] to have normal strength lower extremities bilaterally, but it is hard to tell because she is not really fully cooperative with the exam. However, there is no way she can be as week as she makes it seem and still walk" (Tr. 485). Thus, the undersigned finds no error as the ALJ credited the underlying evidence cited by Dr. Hilton as showing the existence of a medical impairment that reasonably could be expected to produce the plaintiff's pain but further evaluated the intensity and persistence of the plaintiff pain, and the extent to which it affects her ability to work as required by *Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). Ultimately, while the ALJ did not find the plaintiff to be fully credible, he gave the plaintiff the benefit of the doubt in limiting her to sedentary exertional work with additional limitations (Tr. 25).

Based upon the foregoing, the undersigned finds that the ALJ's evaluation of Dr. Lewin's opinion and assessment of the plaintiff's RFC are without legal error and are based upon substantial evidence.

***Vocational Expert and Step Five***

Lastly, the plaintiff argues that the ALJ's hypothetical to the vocational expert did not include all of her limitations and, because the ALJ relied on the vocational expert's response to the allegedly incomplete hypothetical, the Commissioner failed to carry her burden of proof at step five of the sequential evaluation process to show that there are a significant number of jobs in the national economy that the plaintiff can perform (pl. brief 19-20).

The plaintiff specifically argues that the ALJ erred in failing to include the requirement of unscheduled breaks and absences for four days a month in the hypothetical presented to the vocational expert. The plaintiff's RFC is the most she can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989). As indicated above, substantial evidence exists in the record to support the ALJ's decision to give Dr. Lewin's opinion no weight, and Dr. Lewin's opinion is the only basis for the limitations urged by the plaintiff. Dr. Lewin provided no narrative responses and failed to tie any of his check-marked answers to objective evaluations or other medical records. Furthermore, the ALJ's RFC assessment is supported by substantial evidence. Accordingly, the ALJ was not required to include the requirement of unscheduled breaks and absences for four days a month in the hypothetical presented to the vocational expert. *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir.2005) ("Having concluded that substantial evidence supports the ALJ's decision that Johnson suffers from no more than a slight emotional impairment, a slight impairment in gross and fine manipulation, and that any alleged drowsiness is not

25

disabling, the hypothetical questions posed to the vocational expert adequately reflected Johnson's characteristics at the date she was last insured."). As the hypothetical question reflected all of the plaintiff's limitations that were credibly established by the record, the ALJ properly relied on the vocational expert's response to the hypothetical in finding that the plaintiff could perform work existing in significant numbers in the national economy. *See Russell v.* Barnhart, 58 F. App'x 25, 30 (4th Cir. 2003) ("While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record.") (citation omitted). Accordingly, the undersigned finds no error.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 4, 2016
Greenville, South Carolina